**LOS ANGELES NEWS SERVICE, Plaintiff,**

v.

**REUTERS TELEVISION INTERNATIONAL, LIMITED; Visnews International (USA), Limited; Reuters America Holdings, Inc.; Reuters America, Inc., Defendants.**

No. CV–95–1073–KMW (SHx).

United States District Court, C.D. California.

Oct. 4, 1996.

---

William A. Bergen, Law Offices of William A. Bergen, Auburn, CA, for Plaintiff.

Louis P. Petrich, Robert S. Gutierrez, Leopold, Petrich & Smith, A Professional Corporation, Los Angeles, CA, Patricia Duncan, Burbank, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WARDLAW, District Judge.

This matter came on regularly for trial of the question of statutory damages for the infringements of two copyrighted works owned by Plaintiff on September 24, 1996, in the courtroom of the Honorable Kim McLane Wardlaw, United States District Judge. Plaintiff appeared by and through its attorney, William A. Bergen. Defendants Reuters Television International, Ltd., Visnews International (USA), Ltd., Reuters America Holdings, Inc. and Reuters America, Inc. appeared by and through their attorneys Louis P. Petrich and Robert S. Gutierrez of Leopold, Petrich & Smith and Patricia Duncan. Evidence by way of affidavits, written discovery, documents, photographs, videotapes and other exhibits was introduced. This Court previously granted in part and denied in part Defendants' Motion for Summary Judgment by Order entered July 23, 1996, and addresses the remaining issues at this time. The matter having been argued by the parties, taken under submission for decision, and the Court being fully apprised in the premises, and **GOOD CAUSE APPEARING THEREFOR,** the Court does now hereby make the following:

## FINDINGS OF FACT

1. Plaintiff Los Angeles News Service ("LANS") is a fictitious business name of Robert and Marika Tur, who together comprise an independent news organization engaged in the business of independent news gathering and production, and the sale of news video, videotapes, photographs and other products. On April 29, 1992, LANS provided live video coverage from its helicopter of events at Florence Avenue and Normandie Boulevard, including the attacks and beatings of two truck drivers. Plaintiff's copyrighted videotape known as *"Beating of Reginald Denny"* is registered with the United States Copyright Office, bearing Registration No. PA576704, which had its first publication on April 29, 1992 and had an effective date of registration of May 19, 1992. Plaintiff's copyrighted videotape known as *"Beating of Man in White Panel Truck"* is registered with the United States Copyright Office, bearing Registration No. PA576703, which had its first publication on April 29, 1992 and had an effective date of registration of May 19, 1992.

2. While LANS is an independent news operation, it operates under contract to other news organizations and licenses videotapes of news events to be used by other news operations for television and print media. LANS specializes in utilizing its helicopter for news coverage.

3. The Defendants are Visnews International (USA), Ltd., ("Visnews"); Reuters Television International, Ltd.; Reuters America Holdings, Inc.; and Reuters America, Inc.

4. At all relevant times, Visnews was a television news agency that gathered and provided footage of audiovisual material to its subscribers who paid an annual fee for his service.

5. Reuters Television is, among other things, a television news agency that gathers and provides audiovisual news material to its subscribers who pay an annual fee for this service.

6. Reuters America, Inc. is, among other things, a news and information supplier to subscribers who pay an annual fee for this service.

7. Reuters Television International, Ltd. is the successor in interest to Defendant Visnews. Kogan Declaration, Ex. 35.

8. On April 29, 1992, rioting broke out in Los Angeles, including the area of Florence Avenue and Normandie Boulevard, after the announcement of the acquittals of four police officers accused of beating motorist Rodney King.

9. At the time of the Los Angeles Riots, LANS was under contract to KCOP Television, Channel 13 in Los Angeles to provide live video broadcasts of news events, which KCOP could rebroadcast, and also under contract to KNX News Radio for audio broadcasts. *See* Ex. 109. As a part of these contracts, however, LANS would retain ownership of the copyright on all the videotape it shot. LANS never sells the copyright for videotape; it only licenses aspects of its copyrights for broadcasts.

10. Upon arrival at the intersection of Florence and Normandie, Mr. and Mrs. Tur noticed that there were no police present and that looting had begun. Mr. and Mrs. Tur began video and audio coverage, which was broadcast live over KCOP Television. Not only did they document the rioting and looting at that intersection, but they captured the events of certain attacks in particular on video, which are now the copyrighted videotapes at issue: *"Beating of Man in White Panel Truck,"* Ex. 26, and *"Beating of Reginald Denny,"* Ex. 25 (the "Video Works"). These were broadcast live on KCOP, with the narrative report supplied by Robert Tur, and the camera work done by Marika Tur.

11. Because the Video Works were broadcast live over KCOP Television, the demand for them from other news organizations seeking to license the tapes was immediate. Before the Turs had landed their helicopter, the news director at KCOP, Jeff Wald, was fielding calls from other news organizations who sought to obtain licenses to use the tapes. Mr. Wald was in contact with Mr. Tur in the helicopter to field inquiries. Mr. Wald informed all who inquired that LANS owned the copyright to the tapes,

and that all licensing agreements would have to be through LANS. Bob Tur, for LANS, granted limited licenses to the National Broadcasting Company ("NBC") and the American Broadcasting Company ("ABC") to broadcast the Video Works in their news programming within hours after the incident.

12. Bob Tur wanted the Video Works to be seen widely for two reasons. As a reporter, he believed this was an important story that the public needed to know. As a businessman, he believed that if the Video Works were seen over national television, it could create a market for licenses throughout the country to television stations, independent news organizations and news magazines. He decided to license the videotape in a manner so he would not be in breach of the KCOP contract (which prohibited licenses to certain Los Angeles news stations without the explicit permission of KCOP) and still satisfy both goals.

13. LANS, on April 29, 1992, gave a restricted license, the terms of which are disputed, for the Video Works to NBC through an associate producer for NBC named Mike Austin.

14. Mr. Austin knew that KNBC had a helicopter shooting aerials of the developing L.A. Riots. He saw KNBC's footage from the NBC News L.A. Bureau monitor room and believed it to be inferior to that being shown live on KCOP. Watching the live video by the Turs on a monitor side-by-side with a monitor showing KNBC's coverage of the same incidents, he concluded that the Turs' tape was better because it began earlier, had better angles and greater pictures of Reginald Denny.

15. Mr. Tur testified, that, through Mr. Wald, he informed Mike Austin that NBC could license the Video Works for use on its news programs, including the *Today Show*, with certain restrictions. According to Mr. Tur, Mr. Austin was informed that the license was of 48 hours duration only, KCOP had to be credited, and the tape was for network use only and could not be distributed to overseas broadcasters or affiliates. Mr. Tur told Mr. Wald that a reasonable price for NBC's oral license would be worked out later. This conversation with Mr. Wald took place while Mr. Tur was still on board the helicopter, filming and narrating live coverage of the L.A. Riots.

16. Mr. Austin, at the time a temporary production assistant for NBC News, testified that he heard the terms differently. He stated that no conditions or restrictions of any kind were communicated to him and that he was told only that he would later negotiate a reasonable price.

17. The Court finds that Mr. Austin's testimony on the subject of the terms and conditions of the license lacks credibility. His testimony was inherently implausible in some instances and internally contradictory in others. For example, upon examination by Plaintiff's counsel he testified that although he saw the live coverage by the Turs unfolding, he did not believe "time was of the essence" in obtaining the tape from KCOP. Yet, upon examination by Defendants' counsel, in an attempt to explain why he hurriedly wrote the inscription on the Video Works cassette label "See Mike Austin re conditions of use," Ex. 142, testified that timeliness was important because it was a breaking story. Also, with respect to his notation on the label "L.A. Rioting Aerials/From Bob Tur (KCOP–TV) L.A. News Service," Mr. Austin first testified it was made to distinguish the works "from other videos," but later testified that he used the word "aerials" because those were the only aerials he was aware of. Still later, he testified that he had been aware that NBC had shot other aerials at the same time as LANS, but they were inferior to LANS aerials. Finally, Mr. Austin's use of the term "conditions of use" on the label immediately upon receipt of the cassette belies his testimony at trial that there were no conditions of use for the tape. His subsequent explanation that he thought that the requirement of later negotiating a price was a condition or conditions of use is not credible.

18. On the other hand, Mr. Tur's version of the "credit" issue is not supported by the other evidence adduced at trial. Judy Tur's contemporaneous log of communications concerning the licensing arrangements omits any reference to "credits" or "courtesies."

Ex. 7. Furthermore, according to Heather Allan, Judy Tur did not mention credit to KCOP or LANS when she called at 11:30 p.m. the night of April 29. Ms. Allan's log supports her testimony. Ex. 143.

19. Given the circumstances surrounding the negotiation of this oral license, through a third party from a helicopter, in the rush and the heat of the L.A. Riots, for video depicting their violent beginnings, an inference could be drawn either way as to the issue of credit to KCOP as a condition of the license. It is not necessary to the Court's decision to make a finding on that issue, however, because the Court concludes, as both sides argued to prove diametrically opposed contentions, that the Visnews videotape of the copyrighted works bears the downstream in the form of the KCOP logo, Ex. 145, as does the version broadcast on the NBC *Today Show*, Ex. 101. Because Mr. Austin testified that he received a "clean feed" of the video works from KCOP, a fact undisputed in the record, and hand-delivered it to Ms. Allan, his supervisor, it is plain, as Mr. Tur testified, that someone at NBC for some reason placed the KCOP logo on the tape before it was broadcast as part of the NBC *Today Show* segment. The Court further finds that, even if credit was not explicitly discussed on the occasion of the negotiations for the Video Works, the restrictions Mr. Tur sought from Mr. Austin were standard with NBC, except as to the 48–hour limitation, as Mr. Tur testified.

20. At approximately 11:30 the night of April 29, Judy Tur contacted Ms. Allan to inform her of certain restrictions on the use of the works. At 2:15 a.m. Pacific Standard Time Ms. Allan logged those restrictions on the L.A. Bureau monitor. Contrary to normal custom, neither the L.A. Bureau nor the N.Y. Bureau distributed a telex to inform all affiliates and subscribers of these restrictions. Ms. Allan did, however, go to the NBC Newsroom in L.A. to inform everyone there of the restrictions.

21. Plaintiff's Video Works were fed by satellite from NBC's L.A. Bureau to NBC's N.Y. Bureau at 2:20 a.m. Pacific Standard Time on April 30, 1992. This is reflected in Ms. Allan's log entry, Ex. 144. The Video Works were shown, as agreed by license, on NBC's *Today Show* the morning of April 30, 1992. The *Today Show* was fed by satellite from NBC in New York to its stations and network affiliates across the United States.

22. A news "feed" is a term in the communications industry which refers to any transmission, whether through satellite, microwave or hard wire, of video, audio, still image and text material for incorporation in a subscriber's newscasts or publications, at the subscriber's discretion. "Subscribers" are other news and information companies which incorporate news feeds into their broadcasts at their discretion. Subscribers do not include members of the general public. Visnews/Reuters made transmissions of the Video Works to the European Broadcasting Union News Exchange, Visnews Early Evening Feed to Europe, Reuters Television Japan Feed, Reuters Television Latin America/North America Feed, and Reuters Television Asia Pacific Feed.

23. As of April 30, 1992, Visnews and NBC News Overseas, Inc. were parties to an existing television news supply agreement pursuant to which NBC News Overseas agreed to supply to Visnews and license Visnews to use news materials which appeared on the NBC News programs, including the *Today Show*.

24. On the morning of April 30, 1992, the Video Works were transmitted by fiber link from NBC's control room in New York to Visnews' New York Office. Visnews made a videotape copy of the Video Works as broadcast on the *Today Show*. The segment that Visnews copied included the selections from Plaintiff's two Video Works which Mr. Austin had previously copied at KCOP. Visnews transmitted Plaintiff's Video Works, via fiber link, to the New York office of the European Broadcast Union ("EBU"), a joint venture with Visnews and Reuters, which then made a videotape copy of the Video Works.

25. The Visnews/Reuters Defendants were not authorized by LANS to obtain the Video Works from NBC or to use them in any form. LANS did not license its Video Works to Visnews or any Reuters Defendant.

26. There is no direct evidence in the record as to the state of mind of the unidenti-

fied Visnews employee(s) who made the infringing copy of Plaintiff's work from the NBC feed. Nor is there any direct evidence in the record as to the state of mind of the EBU individual who made the infringing copy from the Visnews feed.

27. Given the absence of direct evidence, Plaintiff urges that the Court infer willfulness from (1) a prior conversation between Marika Tur and Richard Wortman, Visnews' "top dog in L.A.," in which Wortman refused to pay several thousand dollars to LANS for a videotape of news events, saying that he would obtain it from NBC; (2) the prior course of conduct between Mr. Wortman on behalf of Visnews in which he regularly sought licenses or permission from LANS to use its videotaped news events that had appeared on KCOP Channel 13; (3) the fact that Visnews employees, including Wortman, could have viewed the restrictions on the broadcast of Plaintiff's work on the NBC monitors; and (4) the fact that the NBC *Today Show* as broadcast bore the downstream "KCOP."

28. Mr. Wortman's conversation with Ms. Tur, his acknowledgment that he had to seek permission from LANS on several occasions to rebroadcast its live videotape coverage of events, and his further acknowledgement to Mr. Tur that it "would be wrong" to use their tape without permission, in the absence of any evidence that he copied the Video Works or knew of or contributed in any way to their unlawful copying, is not evidence of Visnews' willfulness. To the contrary: the Court could easily infer that these statements and conduct reflect a desire to avoid infringing Plaintiff's copyright.

29. There is no evidence in the record that anyone from Visnews actually saw Ms. Allan's log notation, Ex. 143, on the monitor before the NBC *Today Show* news feed was sent at approximately 7:15 a.m. Eastern Standard Time on April 30, 1992. The Court cannot conclude that even if any Visnews employee had seen the log on the bureau monitor that it would have alerted him or her that copying the feed onto a video cassette would be an infringement of copyright.

30. With respect to Plaintiff's last argument, it can be inferred that whoever at Visnews and EBU made the copies of the NBC *Today Show* segment that included Plaintiff's works did know that the feed contained a downstream that credited KCOP for the production. Mr. Tur testified that the downstream conveys that that portion of the tape belongs to an entity other than NBC; and that it would or should alert others who wanted a copy of the tape as to its true ownership. However, Ms. Allan testified that the downstream would not necessarily mean that there were restrictions on the use of the tape. In this case, there existed a news supply agreement between NBC News Overseas and Visnews which could reasonably lead a Visnews employee who saw the downstream to believe that while the tape was owned by KCOP or that KCOP was the appropriate party to contact for a license to use the tape, his or her copying of the tape would not be an infringement of copyright.

31. Further, although both Messrs. Austin and Wortman knew that broadcasting the Video Works required LANS' approval in order to avoid a violation of copyright, there is no evidence in the record to suggest that either Visnews or EBU believed it did not have that approval when the infringing copies were made, or acted recklessly under the circumstances.

32. Thus, this Court finds that Plaintiff has not met its burden of proving that Visnews copied Plaintiff's works with knowledge that its conduct constituted copyright infringement or that Defendants acted in reckless disregard of Plaintiff's copyrights.

33. Nor have Defendants met their burden of proving that Visnews acted with a good faith and reasonable belief in the innocence of its conduct. It may equally be inferred from Ms. Allan's testimony that the presence of the downstream, if viewed by Visnews, could indicate that there were in fact restrictions on any further use of the copyrighted works, and lead a reasonable person to inquire whether copying the feed would infringe a copyright held by KCOP or by another.

34. There is no evidence in the record as to what became of the videocassettes, although copies of them were introduced as

Ex. 145, the PAL version (for European broadcast), and Ex. 117, the NTSC (for American broadcast).

35. Ex. 145, the PAL or European version, is the authentic version of the Video Works and bears a downstream in the form of the KCOP logo.

36. The "slate" on Ex. 143 indicates that it was used either to further transmit the Video Works or as the index for storage and retrieval of the copy of the infringing videotape within the Reuters library. In neither case is the slate relevant to the Court's decision.

37. In 1992 LANS earned between 50–60% of its income from sales of licenses of live videotape material and stock videos thereof.

38. LANS incurs significant expenses in conducting its business, not all of which are directly related to the expenses incurred, and thereby saved by Defendants, in producing the Video Works. These expenses include the approximate $1 million cost of the helicopter, the costs of operating the helicopter, which during the L.A. Riots was greater than $588 per hour, investment in the tape and the videocamera equipment and employee costs.

39. The LANS helicopter was damaged in the approximate amount of $134,000 during filming of the Riots.

40. Near the time LANS created the Video Works, it charged ABC and CBS $3500 for licenses bearing the same restrictions as the NBC license. Later it licensed the works domestically with various restrictions and durations for amounts ranging from $5000 to $6500, Ex. 30.

41. Ms. Tur testified that she would charge $250,000 for an unlimited domestic license of the works. She also testified that she would not actually license the works under such conditions because it would substantially affect their market.

42. An unauthorized airing of one of the Video Works by an entity otherwise licensed to use the work would result in a $10,000 liquidated damage figure. Ex. 30.

43. With respect to the Video Work "Beating of Reginald Denny," LANS se-cured between $250,000–300,000 in license fees. The demand for "Beating of Man in White Panel Truck" was less. This is also evidenced by the first three license agreements in Ex. 30, which each concerns the licensing of the Denny tape specifically. Two of these agreements charge a fee of $5000; the third charges $6500.

## CONCLUSIONS OF LAW

1. This is an action for copyright infringement arising under the Copyright Act, 17 U.S.C. § 101 et seq. Plaintiff alleges that Defendants infringed its copyright by copying the Video Works and by distributing the Video Works in the United States and abroad.

2. Federal jurisdiction and venue are invoked upon the grounds that this is a copyright action under 17 U.S.C. § 101 et seq. of which the Federal Court has exclusive jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Venue is based upon residence within the Central District of California under 28 U.S.C. § 1400(a).

3. On July 22, 1996, this Court granted Defendants' Motion for partial summary judgment and determined the following legal issues:

(a) Defendants are not liable under American copyright law for any damages that may have arisen as a result of alleged extraterritorial infringements as the result of a domestic infringement of the Video Works. This is a clarification of language contained at page 2 of the Court's Order which is more fully explained at page 6 of that Order. The transmissions of the Video Works from Visnews and EBU to Europe did not violate the 1976 Copyright Act because the transmissions were not completed until they were received abroad. Thus they do not constitute domestic infringements within the reach of the United States copyright laws. Subafilms, Ltd. v. MGM–Pathe Communications, 24 F.3d 1088, 1091 (9th Cir.1994).

(b) Visnews made a videotape copy of the Video Works; this is the only act that is supported by admissible evidence that demonstrates a violation of LANS' United States copyright by Visnews.

(c) Visnews is also contributorily liable for the infringement of the United States copyright law that EBU committed when EBU made a videotape copy of the Video Works in New York City, New York, after receiving it via fiber link from Visnews.

(d) The Reuters Defendants are not liable as contributory infringers for the infringement by Visnews when Visnews made a videotape copy of the Video Works in New York City.

(e) There is no evidence that Visnews' fiber link transmission to EBU was a public performance or a distribution so as to be in violation of section 106 of the Copyright Act.

(f) Although the fair use doctrine does not preclude Defendants' liability for domestic infringement, LANS may not recover actual damages because it did not submit admissible evidence that any unauthorized uses of the Video Works are attributable to any of Defendants' activities that infringe United States copyright law.

■ 4. Plaintiff's copyrighted videos are protected under 17 U.S.C. § 106. The use of Plaintiff's works—the Visnews and EBU reproduction of the copyrighted works into videotape copies—is a violation of Plaintiff's copyright. Plaintiff may elect either statutory damages or actual damages under 17 U.S.C. § 504. Plaintiff has selected statutory damages.

5. Plaintiff has not sustained its burden of proving that the infringement was committed willfully, and thus is not entitled to increased statutory damages pursuant to 17 U.S.C. § 504(c)(2).

6. Defendants have not sustained their burden of proving that Visnews and/or EBU were not aware and had no reason to believe that their acts constituted an infringement of copyright, and thus are not entitled to the reduction in statutory damages specified in 17 U.S.C. § 504(c)(2).

7. Plaintiff is entitled to "an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $500 or more than $20,000 as the court considers just." 17 U.S.C. § 504(c)(1).

8. In determining the award of statutory damages "the court's conception of what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like, is made the measure of the damages to be paid ... [T]he court's discretion and sense of justice are controlling ... [within the prescribed statutory limitations ...]. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.... Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 232, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952) (citations omitted); *see Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1336–37 (9th Cir.1990); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B][1][a] at 14–50 (1995) (hereinafter "Nimmer") ("the determination of statutory damages within the applicable limits may turn upon such factors as 'the expenses saved and profits reaped by the defendants in connection with the infringements, the revenues lost by the plaintiffs as a result of the defendant's conduct, and the infringer's state of mind....'").

■ 9. Examining the nature of the copyrighted works at issue, the Court rejects Defendants' argument that the Video Works are more akin to a product of the "sweat of the brow" and therefore undeserving of full copyright protection under *Feist Publications v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 353–54, 111 S.Ct. 1282, 1291–92, 113 L.Ed.2d 358 (1991). The Ninth Circuit laid that suggestion to rest when it held that similar raw videotapes involved sufficient creativity and intellectual input to merit copyright protection as "original works of authorship." *Los Angeles News Service v. Tullo,* 973 F.2d 791, 793 (9th Cir.1992).

■ 10. The Court has previously found in weighing the factors that determine

whether the infringements were a "fair use" that the works were factual in nature and published before the infringements. Indeed, the evidence in this case indicates that the works were so widely published that every person in America could have seen them on one of the three networks that obtained licenses from Plaintiff in the 48 hours following their creation—a fact that minimizes their ensuing value.

11. The nature and value of the copyrighted works must be considered separately with respect to each of the works. *"Beating of Reginald Denny"* plainly enjoyed a greater and more enduring demand than *"Beating of Man in White Panel Truck."* Because of the creative input by the Turs, the latter was sought after by NBC, even when NBC had its own live videotape of the same incident. See Findings of Fact No. 14.

12. The Turs' creation of such works is of great public benefit and should be encouraged. To encourage the creation of such original works, the Turs must be allowed to profit from them, without the concern that expediency, exigent circumstances or the very nature of the fast-breaking news-gathering business will deprive them of potential profits from those works. Statutory damages are designed to fulfill this goal of the Copyright Act, and are particularly necessary to deter what may be at most careless infringement by major news-disseminating organizations whose business it is to supply audiovisual news material worldwide for a fee.

13. Therefore, the Court concludes that with respect to *"Beating of Reginald Denny,"* LANS is entitled to an award of statutory damages for each infringement of $20,000.

14. With respect to *"Beating of Man in White Panel Truck,"* LANS is entitled to an award of statutory damages for each infringement of $10,000.

15. At the outset of the trial, the parties stipulated that there were two copyrighted works at issue, and that each was infringed once. Each side submitted proposed Findings of Fact and Conclusions of Law that calculated statutory damages on the basis of four infringements. *See also* Trial Brief by

Defendants dated September 23, 1996 at 20/1–5.

16. It was not until closing argument, in an attempt to minimize the total award of statutory damages, that Defendants suggested that statutory damages should be calculated with respect to one work, because the two works were taken from one continuous tape, or that Visnews and EBU were liable jointly and severally for each of the infringements, and thus the number of infringements subject to an award of statutory damages should be one. The Court finds that Defendants waived these arguments by failing to raise them before the time of closing argument.

17. In any event, with respect to the "continuous tape" argument, the United States Copyright Office issued Certificates of Registration with respect to each separate work at issue. Exs. 2 and 3. This creates a *prima facie* presumption both as to the validity and copyrightability of each of the works. *See* Nimmer § 12.11[3] at 12–163, 171–74. Defendants have not rebutted that presumption.

18. Moreover, even if the issue of joint and several liability had not been waived, it does not appear that the argument, if successful, would have absolved Visnews of liability for two infringements. While it may be that Visnews and EBU are jointly and severally liable for the second videotape, Visnews is individually liable for the making of the first videotape. Therefore, Visnews would appear to be liable for two separate acts of infringement: first, its own; and, second, the act by EBU to which it contributed. EBU, however, would not be jointly and severally liable for the Visnews independent act of infringement. It would therefore appear that the plain language of Section 505 would not limit the number of infringements subject to the statutory damages award to one.

19. Therefore, Plaintiffs are entitled to a statutory damage award pursuant to 17 U.S.C. § 504(c)(1) in the amounts of $40,000.00 for the two infringements of the *"Beating of Reginald Denny"* and $20,000.00 for the two infringements of *"Beating of*

*Man in White Panel Truck* "; a total award of $60,000.00.

20. The Court reserves ruling on the question of which party, if any, is the prevailing party under 17 U.S.C. § 505 and thus does not award attorney's fees and costs at this time. Each party is to file an initial brief on that issue, together with a proposed judgment in this matter, on or before October 14, 1996. Responsive briefs are to be filed on or before October 21, 1996. The Court will deem the matter submitted without the necessity for oral argument, unless it notifies the parties otherwise.

**IT IS SO ORDERED.**